IN THE UNITED STATES DISTRICT COURT

DISTRICT OF NEW MEXICO

ATLANTIC SPECIALTY INSURANCE
CO.,

      Plaintiff,

v.                                                No. Civ. 13-945 JCH-SMV

DEANS, INC.,

      Defendant.

## MEMORANDUM OPINION AND ORDER

On March 6, 2015, Defendant Deans, Inc., ("Defendant" or "Deans") filed a Motion for Summary Judgment (ECF No. 49). Deans argues that it had no contractual duty to install lightning protection over the four receiving tanks, which it calls the "western battery," at the Cedar Lake facility of Judah Oil, the insured of Plaintiff Atlantic Specialty Insurance Co. ("Plaintiff" or "Atlantic"). Instead, Deans contends that its oral contract with Judah Oil was only for the installation of lightning protection over the battery of tanks located to the east of the western battery, which it refers to as the "eastern battery." Atlantic Specialty opposes the motion, contending that genuine issues of material fact exist to preclude summary judgment as to whether Deans contracted to provide a lightning protection system that would protect all of the Cedar Lake battery of tanks, and whether Deans failed to design and install a code compliant system. The Court, having considered the motion, pleadings, briefs, evidence, and law, concludes that the motion should be denied.

I.      **FACTUAL BACKGROUND**

James "Blaise" Campanella, the owner of Judah Oil, hired Deans, an electrical contractor that specializes in oil field industry work, to perform the general electrical work at Judah Oil's

Cedar Lake facility. *See* Def.'s Mot., Undisputed Fact ("UF") ¶¶ 1, 5, ECF No. 49; Pl.'s Resp. 7-8, ECF No. 50. Cedar Lake is a salt water disposal facility located east of Artesia, New Mexico. Pl.'s Ex. B ¶ 2, ECF No. 50-3. Mr. Campanella owned four disposal facilities: T-Bone, Geronimo, Red Lake, and Cedar Lake. *See* Pl.'s Ex. A 19:8-21:8, ECF No. 50-1. Deans' primary contact from Judah Oil for work at Cedar Lake was Mr. Campanella. Def.'s Mot., UF ¶ 5, ECF No. 49.

Prior to construction of the Cedar Lake facility, Mr. Campanella had asked his partners to invest in lightning protection at the T-Bone facility, but they declined to do so. *See* Pl.'s Ex. A 19:8-21:8, 31:7-22, ECF No. 50-1. On July 5, 2005, lightning hit and burned down the T-Bone facility. *Id.* at 31:7-22. Mr. Campanella then bought his partners out, rebuilt the facility, and hired Deans to put in a lightning protection system at T-Bone. *See id.* at 31:7-32:15. Mr. Campanella relied on Deans to design the system at T-Bone, because he was not familiar and had no experience with lightning protection systems. *See id.* Deans installed a single wire system at T-Bone. *See id.* When Deans first built the facility at T-Bone, its employees did not show Mr. Campanella any paperwork beforehand; instead, the contractors came out and started setting up the poles, guide wires, strand, and rods. *See id.* at 34:3-10. Later, Mr. Campanella hired Deans to install lightning protection systems at his Red Lake and Geronimo facilities as well. *See id.* at 19:8-21:8.

Mr. Campanella, with the help of his partner who is a petroleum engineer, designed the Cedar Lake facility. *Id.* at 38:21-39:4. Prior to construction, the Bureau of Land Management and the Oil Conservation Division of New Mexico approved the engineering plans. *See id.* at 38:21-41:19.

Under the design plan, Cedar Lake was to have a total of 24 tanks: 16 settling tanks, two

2

gun barrel tanks, two oil tanks, and four receiving or unloading tanks. *See* Pl.'s Ex. B ¶ 4, ECF No. 50-3; Pl.'s Ex. C, ECF No. 50-4. The settling tanks were located on the east side of the facility, aligned in two parallel rows, and were 30 feet tall. *See* Pl.'s Ex. A 43:24-44:2, 49:11-50:1, ECF No. 50-1; Pl.'s Ex. B ¶ 4, ECF No. 50-3; Pl.'s Ex. C, ECF No. 50-4. One gun barrel tank was located in the middle of each row of settling tanks. *See* Pl.'s Ex. A 43:24-44:2, 49:11-50:1, ECF No. 50-1; Pl.'s Ex. B ¶ 4, ECF No. 50-3; Pl.'s Ex. C, ECF No. 50-4. There was a row of two oil tanks, located to the west of the settling tanks, then a row of four water receiving tanks. *See* Pl.'s Ex. A 43:24-44:2; Pl.'s Ex. B ¶ 4, ECF No. 50-3; Pl.'s Ex. C, ECF No. 50-4. The receiving tanks located on the west side of the facility were 16 feet tall. *See* Pl.'s Ex. A 43:24-44:2, 49:11-50:1, ECF No. 50-1; Pl.'s Ex. B ¶ 4, ECF No. 50-3; Pl.'s Ex. C, ECF No. 50-4. The initial plan was to have four metal receiving tanks. *See* Def.'s Mot., UF ¶ 18, ECF No. 49; Pl.'s Ex. A 55:3-12, ECF No. 50-1.

Truckers used the four receiving tanks to unload salt water into the facility. Pl.'s Ex. B ¶ 6, ECF No. 50-3. The salt water passed from the receiving tanks into the 16 settling tanks where the hydrocarbons were separated. *Id.* The oil tanks stored the hydrocarbons, while the clean water produced during the separation process was pumped back into the ground. *Id.* The receiving tanks were essential to the operation and function of the Cedar Lake facility. *Id.* ¶¶ 6-7.

From the outset, Mr. Campanella designed the Cedar Lack facility with an overhead static line lightning protection system in mind, similar to his other facilities, because he did not want to lose his facility as had happened before. *See* Def.'s Ex. A 42:8-45:14, ECF No. 49-1. Lightning protection systems contain three components: a point of attraction, a conductive path, and earth connections. Pl.'s Ex. B ¶ 14, ECF NO. 50-3. Overhead static wire lines are designed to attract and dissipate lightning strikes through connected grounding cables and rods that direct

3

the energy safely to the ground. *See* Def.'s Mot., UF ¶ 2, ECF No. 49; Pl.'s Ex. B ¶ 14, ECF No. 50-3. The static lines create an envelope of protection, which essentially extends from the static line down to the ground at a 45 degree angle. Pl.'s Ex. B ¶ 14, ECF No. 50-3. Prior to the time of the fire, Mr. Campanella did not know about the 45 degree rule; he only knew that a wire needed to be over the tanks to some extent. Pl.'s Ex. A 56:5-24, ECF No. 50-1. When he hired Deans, he expected them to be the experts and trusted their information as to how best to install the lightning protection system. *See id.* at 87:19-88:22.

Before construction of the Cedar Lake facility, Mr. Campanella had a meeting with Deans' employees, including general manager JD Atkins and electricians Kenneth Thurman and Joseph ("Joe Bob") Thurman, about what his Cedar Lake project entailed and about installing lightning protection at Cedar Lake based on Mr. Campanella's schematics. *See* Def.'s Mot., UF ¶¶ 2, 8, ECF No. 49; Pl.'s Ex. A 43:1-22, 45:11-14, 55:25-56:4, ECF No. 50-1; Pl.'s Ex. B ¶¶ 3, 20, ECF No. 50-3; Pl.'s Ex. J 47:18-51:12, ECF No. 50-11.[1] They discussed having Deans provide the electrical power service and programmable logic control to Cedar Lake. *See* Pl.' Ex. F 170:16-171:9, ECF No. 50-6; Pl.'s Ex. J 49:17-50:25, ECF No. 50-11. They talked about head switches, power panels, and pumps. Def.'s Ex. C 47:21-51:3, ECF No. 49-3. They also discussed different ways of doing the lightning protection. Pl.'s Ex. A 43:8-22, ECF No. 50-1. Mr. Campanella brought to that meeting a diagram of his plan, giving copies to the Deans employees, including Joseph Thurman. *See* Pl.'s Ex. A 55:13-24, ECF No. 50-1; Pl.'s Ex. J 47:18-51:12, ECF No. 50-11; Pl.'s Ex. K, ECF No. 50-12. That schematic depicted all 24 tanks, including the

---

[1] There is conflicting testimony as to who exactly was at the meeting and what was discussed. *See*, *e.g.*, Pl.'s Ex. J 47:18-51:2, ECF No. 50-11 (Joe Bob Thurman testified that he and Jason McLaughlin were at the meeting to discuss the Cedar Lake project, but he did not remember when the meeting was, that originally he had thought Kenneth Thurman was present, that all of the meetings were running together, that he did not remember anyone else being there, and that they did not talk about the lightning protection system during that meeting). The Court, however, must construe the evidence and all inferences in Plaintiff's favor on a motion for summary judgment, and thus, where there is a conflict, the Court will rely on Mr. Campanella's testimony concerning who and what occurred at the meeting.

four receiving/unloading tanks. *See* Pl.'s Ex. A 55:13-56:4, ECF No. 50-1; Pl.'s Ex. K, ECF No. 50-12.

Mr. Campanella and the Deans' employees also discussed at the meeting the number of static lines Deans would install. *See* Pl.'s Ex. A 48:19-50:1, ECF No. 50-1. They talked about installing north-south static lines that would go over the two rows of nine tanks on the eastern side of the facility. *See* Pl.'s Ex. A 48:19-53:17, ECF NO. 50-1; Pl.'s Ex. B ¶¶ 16-17, ECF No. 50-3; Pl.'s Ex. B2, ECF No. 50-3 at 10 of 11; Pl.'s Ex. B3, ECF No. 50-3 at 11 of 11. These two static lines were the only ones Deans actually installed. *See* Pl.'s Ex. A 53:9-17, ECF No. 50-1; Pl.'s Ex. I 38:12-39:16, ECF No. 50-9.

They also considered at the meeting other static line options. *See* Pl.'s Ex. A 48:19-53:25, ECF No. 50-1. To protect the four receiving tanks near the loading pad of the facility, they talked about two options. *See id.* In the first option ("A/B"), Deans would install an east-west static line over the oil tanks ("line A") and a second static line running east-west from the east of the settling tanks extending over the receiving water tanks ("line B"). *See id.* at 43:24-44:17, 48:19-53:25, 56:5-57:2; Pl.'s Ex. G, ECF No. 50-7. The other option ("line C") they talked about to protect the four receiving tanks was to run a north-south static line over the receiving/unloading tanks. *See* Pl.'s Ex. A 43:24-44:17, 48:19-53:25, 56:5-57:2, ECF No. 50-1; Pl.'s Ex. G, ECF No. 50-7. Mr. Campanella did not know how to set up a static line but suggested both options as possibilities to cover the oil and receiving tanks. *See* Pl.'s Ex. A 54:6-55:2, 56:5-24, ECF No. 50-1. Mr. Campanella, however, explained to Deans that he had an entryway on the south side for trucks to enter the facility, and that on the north side trucks would be coming on the pad, so the poles to support the north-south static line would have to be out of the way of the trucks' movement when servicing the equipment. *See id.* at 43:24-44:21, 51:11-53:5.

At the meeting, they decided that there would not be a need for either option A/B or C. *See id.* at 56:25-57:25. The Deans employees said that additional lines were not needed because the two strands over the settling tanks would provide enough protection. *See id.* Although Mr. Campanella could not recall the total conversation, he said that, for some reason, they decided that there was not a need for the north-south and east-west line over the set of receiving tanks. *See id.* 44:11-45:10, 56:25-57:17. Mr. Campanella stated in his deposition that he believed the reason they decided against the A/B and C options was that the Deans employees represented that the line over the settling tanks would protect the facility because the settling tanks were 30-foot tanks, and the static wire over those higher tanks would protect the lower-profile 16-foot receiving tanks. *See id.* at 44:11-45:14, 56:25-58:4; Pl.'s Ex. B ¶ 4, ECF No. 50-3. Mr. Campanella cannot recall which Deans' employee specifically made that representation to him. *See* Pl.'s Ex. A 56:25-58:4, ECF No. 50-1.

The parties agree that all work performed by Deans at Cedar Lake was done through verbal agreement; no contracts were signed. Def.'s Mot., UF ¶ 3, ECF No. 49. The paper documents exchanged between Judah Oil and Deans were work orders, invoices, and the Cedar Lake diagram. *See* Def.'s Ex. A 28:5-13, ECF No. 49-1; Pl.'s Ex. J, 48:10-16, ECF No. 50-11; Pl.'s Ex. K, ECF No. 50-12.

Mr. Adkins' understanding of the agreement with Judah Oil was that Deans agreed to put in a lightning protection system at Cedar Lake like the systems they put in at the rest of their customers' facilities, similar to what the rest of the oil field community was putting in. *See* Pl.'s Ex. D 91:24-92:14, 99:18-100:8, ECF No. 50-5. Mr. Adkins admitted that a lightning protection system would need to protect the entire facility. *See id.* at 100:19-21. Deans installs a standard oil field design for lightning protection for all its customers. *Id.* at 25:6-18, 110:4-11:2, ECF No.

50-5. Mr. Adkins does not have a copy of the design, nor does he know where the design came from; it is the design that Deans has always installed. *See id.* Deans does not make a specific design unique for each customer. *See id.* Typically Deans installs one static line per row of tanks. *See id.* at 37:11-14. If there are two rows, the number of static lines depends on the height of the pole and the width of the tanks. *See id.* at 37:11-38:10. Deans, however, did not prepare design schematics or other drawings for its work at Cedar Lake, instead its employees design-built the facility in theirs head. *See* Pl.'s Ex. F 170:21-171:9, ECF No. 50-6.

Michael Blackwell is the head of Deans' power line crews that put in light poles and lightning protection and service lines. *See* Def.'s Mot., UF ¶ 22; Pl.'s Ex. A 30:15-22, ECF No. 50-1. Although Mr. Adkins admitted to being the Deans employee who would have the understanding of what the agreement with Judah Oil was for the installation of the lightning protection system, Mr. Blackwell was the Deans employee with the most involvement on the Cedar Lake facility. *See* Pl.'s Ex. D 91:24-93:24, ECF No. 50-5. Mr. Blackwell made the decision about what and where components would be installed, such as the size of the poles and the gauge of the wiring. *See id.* at 93:21-94:6. Prior to his deposition, Mr. Blackwell had not seen the Cedar Lake diagram showing 24 tanks. *See* Pl.'s Ex. I 45:8-14, ECF No. 50-9. Mr. Thurman never gave Mr. Blackwell the diagram Mr. Campanella gave him showing all 24 tanks. *See* Pl.'s Ex. J 65:13-25, ECF No. 50-11. Mr. Adkins, the general manager at Deans, would have the job of communicating project information to his lieutenants, such as Mr. Blackwell. *See* Pl.'s Ex. F 132:3-18, ECF No. 50-6.

During the construction of the Cedar Lake facility, Mr. Campanella, on his own initiative, left holes in the concrete pad for where the lightning protection poles would be placed. *See* Def.'s Ex. A 116:11-24, ECF No. 49-1; Pl.'s Ex. D 94:3-8, ECF No. 50-5. Sometime after the

meeting, Mr. Campanella told Mr. Blackwell to install two static lines over the two rows of settling tanks. Def.'s Mot., UF ¶ 23, ECF No. 49. Soon after that call, Mr. Blackwell visited Cedar Lake and prepared a staking diagram as a guide for the installation crew. *Id.*, UF ¶ 24. The staking sheet he prepared showed only the 18 easternmost tanks, which were the only battery of tanks at the facility at the time of his visit. *See id.* at UF ¶ 25; Def.'s Ex. G, ECF No. 49-7. Mr. Blackwell used the staking sheets to communicate to his crew what they were to build. *See* Pl.'s Ex. I 53:18-23, ECF No. 50-10. In December 2011 and February 2012, Deans installed two static lines over the 18 tanks. *See* Def.'s Ex. A 116:25-117:23, ECF No. 49-1; Def.'s Ex. F 63:19-65:3, ECF No. 49-6; Pl.'s Ex. H, ECF No. 50-8. At the time, Mr. Blackwell did not know that six other tanks were going to be installed at the facility. *See* Pl.'s Ex. I 89:9-17, ECF No. 50-10. Had he known of the additional tanks, Mr. Blackwell "would have possibly suggested something different." Pl.'s Ex. I 88:22-89:8, ECF No. 50-10. Deans invoiced Judah Oil for this work and was paid in full. Def.'s Mot., UF ¶ 27, ECF No. 49; Pl.'s Ex. D 99:20-22, ECF No. 50-5.

At some point after the meeting, Mr. Campanella made the decision to install four fiberglass, rather than metal, receiving tanks. *See* Pl.'s Ex. A 58:5-59:13, ECF No. 50-1. According to Plaintiff's expert, Marcus O. Durham, Ph.D., steel tanks are not self-protected against lightning discharge and ignition, and thus, both metal tanks and fiberglass tanks must be protected from lightning discharge ignition. Pl.'s Ex. B ¶ 21, ECF No. 50-3. Mr. Campanella installed the four tanks after Deans had installed the two-strand lightning protection system. Def.'s Ex. A 116:25-117:23, ECF No. 49-1.

When Mr. Campanella set the fiberglass receiving tanks, he told employees from Deans of the change and that they needed to put up the lightning protection, because the fiberglass tanks needed to be grounded. *See* Pl.'s Ex. A 58:5-60:22, ECF No. 50-1. Mr. Campanella does not

remember which employees he spoke to, whether Joe Bob or Kenny. *Id.* Grounding is important for a lightning protection system. Pl.'s Ex. F 75:5-23, ECF No. 50-6. Mr. Campanella did not discuss with them installing another static line over the receiving tanks because he was relying on Deans' expertise in lightning protection. *See* Def.'s Ex. A 117:5-118:18, ECF No. 49-1. Had a Deans' employee suggested putting another line over the receiving tanks, Mr. Campanella would have agreed to it because he was "not a professional in lightning." *Id.*

At some point, Deans grounded the fiberglass tanks by installing grounding cables to the four receiving tanks and connecting those cables to the grounding Deans had previously provided for the lightning protection system installed at the settling tanks. *See id.*; Pl.'s Ex. B ¶ 19, ECF No. 50-3. Connecting the grounding cables from the receiving tanks to the settling tanks' grounding system integrated the receiving tanks into the lightning protection system at the settling tanks. Pl.'s Ex. B ¶ 19, ECF No. 50-3. The four receiving tanks, however, were outside the zone of protection from the lightning protection system Deans installed over the settling tanks. Pl.'s Ex. B ¶ 17, ECF No. 50-3; Pl.'s Ex. D 86:1-25, ECF No. 50-5.

Cedar Lake started operations in June 2012 and operated until August 19, 2012. Def.'s Ex. A 66:8-17, ECF No. 49-1. On August 19, 2012, lightning struck the second receiving tank from the north at the Cedar Lake facility, igniting hydrocarbon vapors and causing a fire. Pl.'s Ex. B ¶ 8, ECF No. 50-3. The fire destroyed the Cedar Lake facility. *Id.* ¶ 2.

After the fire, Mr. Atkins discovered that the staking sheet Mr. Blackwell made did not match the diagram of the Cedar Lake facility. *See* Pl.'s Ex. D 74:24-77:3, ECF No. 50-5. Although he believed the lightning protection system Deans installed was complete as to the staking sheets, *see id.* at 96:6-10, he acknowledged that another static line would generally protect a tank not within the protection envelope of the first static line. *See id.* at 41:5-19.

Dr. Marcus O. Durham conducted an investigation of the scene following the lightning strike. Pl.'s Ex. B ¶¶ 2-3, ECF No. 50-3. According to Dr. Durham, Deans was under a duty of care to design and install lightning protection systems according to NFPA 780, "The Standard for the Installation of Lightning Protection Systems," a consensus industry standard prepared and published by the National Fire Protection Association. *Id.* ¶ 13. Dr. Durham's calculations at the scene, using a method prescribed by NFPA 780, revealed that the four receiving tanks were outside the zone of protection provided by the two static lines installed over the settling tanks. *Id.* ¶¶ 16-17.  Dr. Durham concluded that Deans' omission of a static line over the four receiving tanks was a failure to comply with NFPA 780 and proximately caused the August 19, 2012 fire that damaged the Cedar Lake facility. *Id.* ¶¶ 22-24. Mr. Adkins testified that Deans does not try to follow NFPA 780 when it is installing a lightning protection system for a customer. Pl.'s Ex. D 57:5-11, ECF No. 50-5.

Plaintiff Atlantic Specialty provided property insurance to Cedar Lake SWD, LLC, and Judah Oil, LLC. Pretrial Order, Stipulated Fact ¶ 8, ECF No. 39. After the fire, Cedar Lake SWD/Judah Oil presented a claim for benefits to Plaintiff Atlantic Specialty, and Plaintiff made payments to or on behalf of Cedar Lake SWD for damages caused by the fire. *Id.* ¶¶ 9-10. Plaintiff is contractually and equitably subrogated to the extent of payments it made for damages resulting from the fire. *Id.* ¶ 11.

On September 30, 2013, Plaintiff sued Deans for negligence and breach of contract. Compl., ECF No. 1. Plaintiff asserts that Deans owed a duty to Judah Oil to properly perform the design and installation of the lightning protection system at Cedar Lake. *See id.* ¶ 17. Plaintiff contends Deans breached this duty of care by failing to properly and reasonably perform the design and installation of the lightning protection system at Cedar Lake in a good and

workmanlike manner that would prevent foreseeable damage from a lightning strike. *Id.* ¶ 18. Plaintiff asserts that Deans contracted with Judah Oil to design and install an adequate and functioning lightning protection system at Cedar Lake, that Deans performed work under the contract, but that Deans breached the contract by failing to properly design and install the lightning protection system. *See id.* ¶¶ 21-24.

Subsequently, Deans filed a motion for summary judgment, arguing that there is no evidence of an oral contract between Deans and Judah Oil for the installation of lightning protection over the "western battery" at Cedar Lake. Def.'s Mot. 16, ECF No. 49. Deans argues it is entitled to summary judgment on both claims because it never agreed to install lightning protection over the receiving tanks, and thus, it could not have breached any duty of care.

## II. STANDARD

On a motion for summary judgment, the moving party initially bears the burden of showing that no genuine issue of material fact exists. *Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993). Once the moving party meets its burden, the nonmoving party must show that genuine issues remain for trial. *Id.* The nonmoving party must go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "All facts and reasonable inferences must be construed in the light most favorable to the nonmoving party." *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1527 (10th Cir. 1995) (internal quotations omitted). Under Rule 56(c), only disputes of facts that might affect the outcome of the case will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48

(1986). There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *See id.* at 248.

## III. ANALYSIS

### A. Breach of Contract

To enforce a contract, a plaintiff must show evidence of an offer, an acceptance, consideration, and mutual assent. *Hartbarger v. Frank Paxton Co.*, 857 P.2d 776, 780 (N.M. 1993). Mutual assent requires a meeting of the minds of the parties and mutuality. *Trujillo v. Glen Falls Ins. Co.*, 1975-NMSC-046, ¶ 6, 540 P.2d 209. Mutuality must be found in the objective manifestations of the parties, their express assent, and not any secret or undisclosed intent. *Id.* ¶ 7.

"[W]hen the existence of a contract is at issue and the evidence is conflicting or admits of more than one inference, it is for the jury to determine whether the contract did in fact exist." *Segura v. Molycorp, Inc.*, 1981-NMSC-116 ¶ 24, 636 P.2d 284. "It is the duty of the court to interpret the terms of a contract when these terms have been clearly established but when the terms of a contract are in controversy, it is for the jury to determine the terms and it is not the province of the court to instruct the jury what the terms are." *Id.* ¶ 25. A jury may find any of the four requirements, even if not expressly stated, in the surrounding circumstances, including the parties' words and actions, what they wanted to accomplish, the way they dealt with each other, and how others in the same circumstances customarily deal with each other. N.M. UJI 13-801.

Defendant argues that the only agreement reached was to install two static lines over the eastern battery. As to Plaintiff's contention that Mr. Campanella justifiably relied on a representation from Deans that the two lines would sufficiently protect the entire facility, Deans suggests that any such fact may be relevant in a fraud or misrepresentation claim, but not in a

breach of contract and negligence case, as here.

It is undisputed that the parties agreed to the installation of two static lines over the 18 tanks. There is a question of fact, however, as to whether the terms of the oral agreement also included a term that Deans would install a lightning protection system that would protect all 24 tanks at the Cedar Lake facility. The facts and inferences, when construed in Plaintiff's favor, create a genuine issue of material fact as to whether Deans entered into an oral contract to design and install a lightning protection system that would protect all 24 tanks that Judah Oil intended to, and did, build at the facility. Contrary to Defendant's argument, there is evidence of more than merely Mr. Campanella's subjective, undisclosed understanding. Mr. Campanella testified at his deposition that he and Deans' employees discussed and orally agreed to have Deans design and install a lightning protection system for the entire facility – all 24 tanks – based on Mr. Campanella's schematics for the facility that he brought to the meeting. Moreover, there is evidence that Mr. Adkins' understanding of the agreement with Judah Oil was that Deans agreed to put in a lightning protection system at Cedar Lake similar to what the rest of the oil field community was putting in, and he admitted that a lightning protection system would need to protect the entire facility. Because there is evidence that, at the time Deans agreed to install a lightning protection system, Mr. Adkins understood the facility was to have 24 tanks, Mr. Adkins' testimony could be viewed by the jury as supporting Mr. Campanella's version of events. A jury could also construe the fact that Deans' employees grounded the four receiving tanks as corroboration of an agreement to design and install lightning protection for the entire facility, albeit with an allegedly flawed design.

Mr. Campanella stated in his deposition that a Deans employee represented to him in the pre-construction meeting, when they agreed to the project, that the installation of two lines over

only the settling tanks would protect the entire facility because the settling tanks were 30-feet tall, and the static wire over those higher tanks would protect the lower-profile 16-foot receiving tanks. Mr. Campanella testified that he agreed to only two lines based on Deans' representation that two lines would protect the entire facility. Although the Deans employees do not recall making such a representation, a jury may choose to credit Mr. Campanella's testimony, and if so, could find that the contract included the term to provide an adequate system to protect all 24 tanks.

The Court recognizes that the terms of the agreement, based on the evidence construed in Plaintiff's favor, do appear to conflict, because the specific term to install two static lines, when completed, would not itself be sufficient to satisfy the more general term to design and install a lightning protection system that would protect all 24 tanks. Any inconsistency, however, does not establish that there was no meeting of the minds or mutual assent, the thrust of Defendant's motion. Rather, the evidence, construed with all inferences in Plaintiff's favor, indicates that both parties were operating under the same mistake of fact – that two static lines were sufficient to protect the entire facility. That same understanding allegedly occurred because Mr. Campanella relied on Defendant's mistaken belief that two lines would protect all 24 tanks.

Defendant relies on the case of *Trujillo v. Glen Falls Ins. Co.*, 1975-NMSC-046, 540 P.2d 209, for the proposition that, to prove mutual assent, a plaintiff must show that the parties agreed to the same details and attached the same meaning to the terms. In *Trujillo*, the parties attached different meanings to an ambiguous, essential term used in the contract, so the New Mexico Supreme Court determined that there was no mutual assent. *See id.* ¶ 10. This case, however, is distinguishable. Plaintiff's version of facts indicates the parties both attached the same meaning to the terms and were mistaken in the same manner. The Court thus disagrees

with Defendant that a reasonable jury could not find that the parties had a meeting of the minds and mutually assented to an agreement to provide lightning protection for all 24 tanks. Accordingly, the Court will deny Defendant's motion for summary judgment on the breach of contract claim.[2]

### B.     Negligence

"Generally, a negligence claim requires the existence of a duty from a defendant to a plaintiff, breach of that duty, which is typically based upon a standard of reasonable care, and the breach being a proximate cause and cause in fact of the plaintiff's damages." *Herrera v. Quality Pontiac*, 2003-NMSC-018, ¶ 6, 73 P.3d 181. Defendant argues it is entitled to summary judgment on this claim because, "[w]ithout evidence of an oral contract for the installation of lightning protection over the western battery …, Deans had no duty to Judah Oil to install lightning protection over the western receiving tanks." Def.'s Mot. 22, ECF No. 49. For the reasons herein discussed, the Court finds that there is sufficient evidence to create a genuine issue of material of fact as to whether Deans entered into an oral agreement to install lightning protection for all 24 tanks, and thus, whether Deans had a duty to install adequate lightning protection over the four receiving tanks.

Defendant also contends that there is no evidence of causation or damages from Deans' work because all the alleged damages relate to lightning striking the "western battery," for which it argues it had no agreement or duty to provide lightning protection. Again, a jury could conclude, based on the evidence construed in Plaintiff's favor, that Deans orally agreed to design and install a lightning protection system for the entire system; that Deans' failure to install an

---

[2] The parties' arguments focused on mutual assent and whether there were sufficient facts for a jury to find that the oral agreement contained a term to provide lightning protection for all 24 tanks. The briefs did not focus on any other theories of contract law regarding the effect or potential consequences of mutually agreed contract terms that may be inconsistent with one another. The Court will not *sua sponte* reach any issues that the parties did not address and support with authority in their briefs.

overhead static line over the four receiving tanks breached its duty of care to design and install an adequate lightning protection over all 24 tanks; and that if it had installed an additional static line over the four receiving tanks, all 24 tanks would have been protected. Plaintiff has thus provided sufficient evidence of a duty, breach of the duty, causation, and damages to present the negligence claim to a jury. The Court will deny Defendant's motion for summary judgment on Plaintiff's negligence claim.

    **IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment (**ECF No. 49**) is **DENIED**.

                                                     **UNITED STATES DISTRICT JUDGE**